**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

_____

NOREEN HEAD,

          Plaintiff,

v.                                 Case No. 21-cv-12634

DETROIT STOKER COMPANY,

          Defendant.

_____/

**OPINION AND ORDER DENYING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

      This is an employment discrimination case, wherein Plaintiff chiefly alleges retaliatory termination due to her use of medical leave while ill with Covid-19 and related complications. (ECF No. 1.) Pending before the court are cross motions for summary judgment. Plaintiff moves for partial summary judgment as to her claims for retaliation and interference under the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 _et seq._, arguing that a genuine issue of material fact exists with respect to her remaining claim under Michigan's Workers' Disability Compensation Act ("WDCA"), MICH. COMP. LAWS § 418.301 _et seq._[1] (ECF No. 24.) Defendant conversely moves for summary judgment with respect to all of Plaintiff's claims. (ECF No. 25.) The motions have been fully briefed. A hearing is unnecessary. _See_ E.D. Mich. LR 7.1(f)(2). For reasons explained below, the court will deny Plaintiff's motion and grant Defendant's.

_____

[1] Plaintiff withdrew her other two claims under Michigan's Covid-19 Employment Rights Act, Mich. Comp. Laws § 419.401 _et seq._, and Michigan's Persons with Disabilities Civil Rights Act, Mich. Comp. Laws § 37.1101 _et seq._, in her response to Defendant's summary judgment motion. (ECF No. 30, PageID.1211.)

## I. BACKGROUND[2]

### A. Plaintiff's General Employment History

Plaintiff's employment with Defendant began in 2002. (ECF No. 24, PageID.562; ECF No. 25, PageID.749.) Throughout her nearly twenty-year tenure with the company, she held various positions within the accounting department, her final post being an "Accounts Receivable Billing Coordinator." (Id. at PageID.563; id.) In 2019, the accounting department consisted of six positions, including Plaintiff's. (ECF No. 25, PageID.750–51.) The other roles were as follows: Vice President of Finance, held by Matthew Holody; Manager of General Accounting, held by Debbie Conner; Accounts Payable Manager, held by Glenda Thomas; Cost Accountant, held by Bob Ramirez; and a vacant Account Generalist post. (Id.) Plaintiff reported to Mr. Holody and Ms. Conner. (ECF No. 30-33, PageID.1421–22.) All employees in the accounting department, except Plaintiff, were salaried professionals with college degrees.[3] (Id.)

Though not exhaustive in her view, Plaintiff's principal responsibilities included the following: (1) processing payroll; (2) conducting payroll-related accounting functions, such as journal entries and balancing general ledger accounts; (3) communicating with customers regarding past-due invoices; (4) reconciling the payroll monthly bank

---

[2] Unless otherwise noted, the material facts presented in this section are uncontested.

[3] Plaintiff first admits that her coworkers possessed college degrees (ECF No. 30, PageID.1219) while later contesting the same as inadmissible hearsay because Defendant did not provide the court with the resumes of every accounting department employee (ECF No. 30, PageID.1225–26.) Plaintiff then proffers an exhibit (ECF No. 30-3, PageID.1273) containing information that two of her co-workers possess college degrees. The court is not convinced that Defendant has tried to introduce inadmissible hearsay evidence. Moreover, in light of Plaintiff's admissions regarding the degree issue, Plaintiff's objections are frivolous.

statements; (5) preparing for year-end closing and cash flow analysis, as needed; (6) running various payroll reports; and (7) uploading payments to the company's bank accounts. (ECF No. 25, PageID.750; ECF No. 30, PageID.1219.) She also helped perform Defendant's monthly cost accounting, filed invoices for the Accounts Payable Manager, handled wire transfers, identified chargebacks to vendors, reviewed service time reports, charged customer credit lines, and monitored the calculation of sales tax in Defendant's various divisions. (ECF No. 30, PageID.1226.) Overall, Plaintiff performed her work to Defendant's satisfaction. (ECF No. 25-5[4], PageID.885.) Nonetheless, on June 14, 2021, while on FMLA leave, Plaintiff was terminated with an effective date of June 25, 2021. (ECF No. 24, PageID.568; ECF No. 25, PageID.760.) The parties dispute whether Plaintiff's removal was done in violation of the FMLA and WDCA or as part of a company-wide, economic-based reduction in force.

### B. New Company Leadership

In November of 2019, Defendant hired a new president, Richard Sroda. (ECF No. 25, PageID.751; ECF No. 30, PageID.1220.) In that capacity, Mr. Sroda determined Defendant would need to reduce its labor costs to remain profitable. (ECF No. 25-6, PageID.892.) To that end, Mr. Sroda began a staffing analysis, identifying various positions for elimination throughout the company. (Id.) He first did away with certain

---

[4] Plaintiff complains that the declarations submitted on Defendant's behalf by Kristy Schuyler (ECF No. 25-5) and Richard Sroda (ECF Nos. 25-6, 31-3) contradict their deposition testimonies; despite selectively relying on parts, she seeks for them to be stricken. (ECF No. 30, PageID.1224, 1227.) Having reviewed the declarations and the provided portions of the deposition testimonies, the court disagrees with Plaintiff's assessment. While they expand upon the deposition testimony, the declarations are not so broad as to imply that the depositions themselves contain significant omissions nor are they contradictory. *See Aerel, S.R.L. v. PCC Airfoils, L.L.C.*, 448 F.3d 899, 906–08 (6th Cir. 2006). Accordingly, the court declines to strike them.

vacant positions, including the Account Generalist post, resulting in an 11% decrease to Defendant's overall workforce. (Id.; ECF No. 30, PageID.1220.) Defendant also offered early retirement packages to union employees per relevant collective bargaining agreements. (ECF No. 25-6, PageID.892.) To further reduce staffing levels and labor costs, Mr. Sroda attests to next reviewing the work of various departments, evaluating employee skill sets, and selecting for elimination those roles with job duties that could be easily transferred to other employees. (Id.)

Mr. Sroda's review included the accounting department, which he found to be overstaffed. (ECF No. 25-6, PageID.892.) By spring of 2020, through discussions with Mr. Holody and Defendant's Director of Human Resources, Kristy Schuyler, Mr. Sroda resolved to eliminate Plaintiff's position because it was hourly and comprised of primarily clerical duties absorbable by other accounting department employees. (ECF No. 25-6; PageID.893.) Mr. Sroda further determined that Plaintiff lacked the requisite skills, experience, and qualifications to perform the job duties of any other accounting department position. (Id.) Plaintiff disputes this, contending that she was qualified for the position of Accounts Payable Manager. (ECF No. 30, PageID.1226–27; ECF No. 31-3.) When pressed regarding what prompted the decision to reduce Defendant's workforce, Mr. Sroda specifically testified as follows:

> Q    Okay. Rick, I just want to ask you: What led to you wanting to reduce your force? Was it a financial decision for Detroit Stoker Company?
>
> A    When I -- so the short answer is yes. Yes, it was a financial decision, based on what we saw coming down the pipeline for work and resources needed, as well as my experience running other companies that are similar to Detroit Stoker but larger, and successfully being able to operate with a much smaller accounting department.
>
> Q    What did you see coming down the pipeline with regard to your work in resources?

A       Well, at that time, you know, end of Q1 of 2020 was when COVID was
        starting to get hot and heavy, which then prevented our sales organization
        from really getting out and selling. And we sell projects. So, you know,
        most of the projects are millions of dollars, and they take years to kind of,
        you know, get the customer to buy the product. So we have a backlog of
        work, and you could see that that backlog was decreasing and our
        bookings were not refilling or replacing the backlog that was decreasing.
        The short answer is our bookings were the first key indicator. They were
        dropping off.

(ECF No. 30-32, PageID.1405–06.)

### C. Defendant's Reduction in Force

Though finalized in early 2020, Defendant's company-wide reduction in force was

not immediately implemented for the following reasons: Mr. Sroda needed to prioritize

the running of the company while navigating the challenges of the 2020 pandemic; Mr.

Sroda did not want to create employee tension issues by immediately conducting a

reduction in force so soon after his arrival; and department managers needed adequate

time to redistribute job duties of soon-to-be eliminated positions. (ECF No. 25-6,

PageID.893–94.) So, in late 2020, Mr. Sroda set the elimination of Plaintiff's position for

the second quarter of the company's 2021 calendar year, that is, by April, May, and/or

June of 2021. (Id. at PageID.895.) More specifically, the deadline of June 30, 2021 was

included as part of Mr. Holody's 2021 performance objectives, prepared in December of

2020 and presented to Defendant's leadership team in January of 2021. (Id.)

Notably, the only documentary evidence of Mr. Holody's performance objective is

contained in an Excel file, titled "Employee Performance Evaluation – Matt Holody

2021."[5] (ECF No. 31-3, PageID.1538–48.) The file was attached to email

---

[5] Defendant has also submitted two undated bullet point lists titled "Anecdotal thoughts,"
which it contends are Mr. Sroda's "organizational staffing plan" developed in late 2019.
(ECF No. 25-4, PageID.873; ECF No. 31-6, PageID.1556–57.) The first list notes in one

correspondence between Mr. Sroda and Mr. Holody in February of 2021. (Id.) Among

other things, the document denotes a "Responsibility" for "Matt" of "Identify options to

reduce accounting department size to total 3 pp [sic]" using a "Metric" of "plan" and

"Completion Date" of "6/30/21." (Id. at PageID.1545.) A "Target" column further notes

the responsibility as "complete." (Id.) Plaintiff contests the reliability of this document

and its validity as a business record, highlighting that it does not explicitly identify her

position for elimination. (ECF No. 30, PageID.1227–31.)

Though Plaintiff challenges the legitimacy of her termination, it is undisputed that

Defendant's "workforce reduction was implemented in stages by department" from

January of 2021 through August of 2021, affecting eleven total employees, Plaintiff

included. (ECF No. 30, PageID.1247; ECF No. 25-6, PageID.894.) Per Defendant, the

following positions were eliminated:

| Title | Termination Date |
|---|---|
| Project Manager | 1/18/21 |
| Project Manager | 3/31/21 |
| Senior Staff Engineer | 3/31/21 |
| Technician | 3/31/21 |
| Technician | 3/31/21 |
| Technician | 3/31/21 |
| A.R. Billing Coordinator | 6/25/21 |
| CSR/Inside Sales Rep. | 8/6/21 |
| Service Coordinator | 8/6/21 |
| Assistant Facility Supervisor | 8/6/21 |
| Service Consultant | 8/6/21 |

---

bullet as follows: "Accounting generalist – accounting already has more resources than
needed. Past experience, 5 v. 3 for $100M. Data usage." (ECF No. 31-6, PageID.1556.)
The second list has virtually the same note: "Accounting generalist position (open) –
accounting already has more resources than needed. Past experience, 5 v. 3 for
$100M. Data usage high." (Id. at PageID.1557.)

6

(ECF No. 25-6, PageID.894–95.) Plaintiff's only qualm with this list is the termination of the Project Manager on January 18, 2021. (ECF No. 30, PageID.1232–33.) She correctly asserts that, based on Defendant's termination paperwork, the elimination of both Project Managers and of the Senior Staff Engineer was effective March 31, 2021, thereby making her reduction the only single employee termination during the entire reduction in force period. (Id.; ECF No. 30-9, PageID.1287–1304.) She further highlights that Defendant itself delineated its reductions in force by month, suggesting that each reduction in force must be evaluated discreetly by that metric. (ECF No. 30, PageID.1233; ECF No. 24, PageID.569.) She also notes that Defendant created decisional unit analyses for every other reduction besides hers. (Id.) Additionally, at least two project managers that were part of the decisional unit for the January 2021 reduction in force remained employed as engineers with Defendant's engineering department. (ECF No. 30-32, PageID.1414.) Defendant cautions that it is misleading to claim these employees were offered alternate positions, as the project management department was merely consolidated with engineering. (ECF No. 33, PageID.1744.)

Defendant admits that it did not meet its projected reduction goal for the accounting department by June 30, 2021. (ECF No. 31-3, PageID.1539.) It blames Mr. Holody for failing to develop a plan to redistribute work responsibilities such that another accounting department employee could be timely terminated. (Id.) This issue was set to be discussed during Mr. Holody's regular goal review meeting at the end of July, but Mr. Holody voluntarily tendered his two weeks' notice of resignation on July 26, 2021. (Id. at PageID.1540.) Thus, Defendant asserts that it effectively met its reduction goal for the accounting department with Mr. Holody's subsequent departure. (Id.) To underscore this

point, Defendant asserts that, at present, only three positions remain in its accounting department: a Controller position, which encompasses the duties and responsibilities of the former Vice President of Finance and Manager of General Accounting positions; the Cost Accountant position; and the Accounts Payable Manager position. (ECF No. 25-5, PageID.888–89; ECF No. 31-2, PagID.1537.)  Further, Plaintiff's job duties were redistributed to employees in both the human resource and accounting departments. (ECF No. 25-5, PageID.888–89.)

### D. Plaintiff's Covid-19 Bout and Related FMLA Leave

In the midst of Defendant's reduction in force, Plaintiff became severely ill with Covid-19, testing positive for the virus on April 13, 2021. (ECF No. 24, PageID.563–64; ECF No. 31, PageID.1496.) She was hospitalized due to Covid-19 complications from April 16, 2021 through May 2, 2021. (Id. at PageID.564–65; id. at PageID.1497–98.) After her discharge on May 2nd, Plaintiff's recovery required at-home rehabilitation therapies. (ECF No. 30-30, PageID.1387–94.) In late May of 2021, her anticipated return to work date was June 25, 2021. (Id.) Defendant first approved Plaintiff for FMLA leave from April 16th through May 2nd without requiring medical certification. (ECF No. 25, PageID.759; ECF No. 30, PageID.1240.) Thereafter, it required documentation for further FLMA leave approval from May 2nd until Plaintiff's return to work. (Id.) Plaintiff submitted the requisite forms and, on or about June 8, 2021, Defendant approved her entire FMLA leave request from April 16th through June 25, 2021. (Id.) During this time, Defendant sent flowers to Plaintiff and further assisted Plaintiff's husband with faxing his own FMLA paperwork to his employer. (ECF No. 31-2, PageID.1535–36.)

While the genuineness of Plaintiff's illness and need for leave is undisputed, the parties do dispute whether she contracted the disease while at work. (ECF No. 24, PageID.563–64; ECF No. 31, PageID.1496.) Plaintiff asserts that, on April 8, 2021, she was diagnosed at a doctor's appointment with "[t]ype 2 diabetes mellitus without complication, without long-term current use of insulin (CMS/HCC)." (ECF No. 24-4, PageID.595, 600–01.) She was accordingly prescribed a daily dosage of metformin. (Id. at PageID.601–02.) At her appointment, Plaintiff showed no signs of Covid-19. (ECF No. 24, PageID.562; ECF No. 31, PageID.1495.) However, on April 9th, Plaintiff began to experience an upset stomach, diarrhea, and vomiting, all of which she attributes to her new metformin prescription. (Id. at PageID.562–63; id. at PageID.1495–96.) She continued her medication regimen through the weekend. (Id.) On April 12, 2021, Plaintiff reported to work, mentioning to a co-worker that she felt unwell due to the side effects of her new medication. (Id.) While there, Plaintiff interacted with Ms. Conners and Ms. Thomas. (Id.) On April 13, 2021, Plaintiff reported to work, again feeling unwell. (Id.) After approximately three hours, Ms. Conners told Plaintiff to get a Covid-19 test, the results of which were positive. (Id.) She was one of four employees who tested positive for Covid-19 between April 12th and 16th. (ECF No. 24, PageID.563–64; ECF No. 31, PageID.1496.) Plaintiff believes she contracted Covid-19 while at work from Ms. Conners. (ECF No. 30-35, PageID.1485.)

On Defendant's behalf, Ms. Schuyler attests that, upon learning of Plaintiff's diagnosis, she attempted to confirm whether Plaintiff complied with Defendant's Covid-19 safety protocols for contact tracing purposes. (ECF No. 25-3, PageID.856–57; ECF No. 25-5, PageID.886–87.) She tried to communicate with Plaintiff directly regarding the

subject but was unable to reach her. (Id.) However, through conversations with other employees who tested positive around the same time as Plaintiff, Ms. Schuyler verified that the other Covid-19-positive employees were either not in the office with Plaintiff or properly followed mask and social distancing measures. (Id.) Based on her contact tracing investigation, Ms. Schuyler concluded that Plaintiff contracted the virus from a close family member who was positive in late March of 2021. (Id.) She noted that Plaintiff began experiencing symptoms on April 9, 2021, which predates any in-person interaction with fellow Covid-19-positive employees. (Id.) As previously mentioned, Plaintiff contests that she had Covid-19 symptoms on April 9th but does admit that her metformin side effects mirror certain signs of the virus. (ECF No. 30-33, PageID.1441–42.) To the extent that Plaintiff's medical records conflict with her assessment of her symptoms, Plaintiff asserts they are wrong. (Id. at PageID.1441.)

### E. Plaintiff's Termination

On May 23, 2021, Ms. Schuyler sent an email to Mr. Sroda and Mr. Holody with the subject line "Reduction in force – Finance." (ECF No. 24-30, PageID.735.) The email discusses "details to date related to Noreen and the elimination of her position," and further indicates that Defendant was "awaiting a response with respect to [its] legal risk exposure." (Id.) On May 28, 2021, Ms. Schuyler followed up with additional details to which Mr. Sroda responded with a request for "an ETA regarding when Noreen might be returning to work." (Id. at PageID.734.) Ms. Schuyler responded, per "secondhand information," approximately June 25, 2021, adding that Plaintiff's twelve weeks of FMLA leave would expire the first full week in July. (Id.)

On June 14, 2021, while she was still on FMLA leave, Defendant terminated Plaintiff's employment, effective June 25, 2021, ostensibly as part of the company-wide reduction in force. (ECF No. 24, PageID.568; ECF No. 25, PageID.760.) Ms. Schuyler and Mr. Holody informed Plaintiff telephonically of the decision after gathering certain payroll details and confirming her anticipated return to work date. (ECF No. 25, PageID.760; ECF No. 30, PageID.1242.) Plaintiff asked if another position was available for her; Ms. Schuyler responded no, referencing the ongoing workforce reduction. (ECF No. 30-33, PageID.1453; ECF No. 25-5, PageID.888.) On July 9, 2021, Ms. Schuyler emailed Mr. Sroda and Mr. Holody a draft announcement about Plaintiff's termination that directed recipients to continue sending payroll inquiries to Mr. Holody. (ECF No. 24-32, PageID.739.)

When pressed regarding the timing of Plaintiff's elimination, Mr. Sroda testified that Defendant postponed Plaintiff's termination so that she could receive the full benefit of her FMLA leave while saving her from the "embarrassment" of returning to work only to be let go. (ECF No. 25-6, PageID.895; ECF No. 30-32, PageID.1409.) He further indicated that other business-related issues of greater concern took priority over eliminating "that one position" before April. (ECF No. 30-32, PageID.1411.)

Roughly four months after her termination, on November 9, 2021, Plaintiff filed the present lawsuit. (ECF No. 1.)

## II. STANDARD

Summary judgment is proper where no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

248 (1986). The central issue is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52. The court must view the evidence and draw all reasonable inferences in favor of the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

The moving party bears the initial burden of presentation that "demonstrate[s] the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). There is no requirement, however, that the moving party "support its motion with [evidence] negating the opponent's claim." *Id.* (emphasis removed). In response, "the nonmoving party must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co.*, 475 U.S. at 587 (emphasis removed) (quoting Fed. R. Civ. P. 56(e)). This requires more than a "mere existence of a scintilla of evidence" or "'[t]he mere possibility of a factual dispute." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986); *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582 (6th Cir. 1992). Where, as here, the parties have filed cross motions for summary judgment, the court must still "evaluate each motion on its own merits and view all facts and inferences in the light most favorable to the nonmoving party." *Westfield Ins. Co. v. Tech Dry, Inc.*, 336 F.3d 503, 506 (6th Cir. 2003). The mere fact that the parties filed such cross motions does not automatically justify the conclusion that no facts are in dispute or that an award of summary judgment is appropriate for either party. *See Parks v. LaFace Records*, 329 F.3d 437, 444 (6th Cir. 2003).

Cases of alleged discrimination involving state of mind issues are not necessarily inappropriate for summary judgment, *Betkerur v. Aultman Hospital Association*, 78 F.3d

1079, 1087 (6th Cir.1996), and, in the employment context, conclusory allegations and subjective perceptions or assessments do not constitute evidence "sufficient to stave off summary judgment." *Wade v. Knoxville Utils. Bd.*, 259 F.3d 452, 463 (6th Cir. 2001); *see also Chappel v. GTE Prods. Corp.*, 803 F.2d 261 (6th Cir. 1986) ("Mere personal beliefs, conjecture and speculation are insufficient to support an inference of [ ] discrimination.").

### III. DISCUSSION

### A. FMLA Generally

The FMLA confers substantive rights on eligible employees to use twelve weeks of leave for protected reasons and to return to their job after using said leave. *Milman v. Fieger & Fieger, P.C.*, --- F.4th ----, 2023 WL 387293, at *3–4 (6th Cir. 2023). Two recognized theories of recovery exist under the FMLA: interference and retaliation. *Tennial v. United Parcel Serv., Inc.*, 840 F.3d 292, 307 (6th Cir. 2016). "Although a plaintiff can proceed under both theories, the proof needed for each claim differs. A plaintiff proceeding under a retaliation theory must show discriminatory or retaliatory intent, whereas a plaintiff alleging interference need not prove any unlawful intent on the part of his employer." *Id.* at 307–08 (internal citations omitted). Here, Plaintiff asserts that her FMLA rights were violated under both theories.

### 1. FMLA Retaliation

In asserting her claim of FMLA retaliation, Plaintiff specifically invokes the protections under 29 U.S.C. § 2615(a)(2), alleging that "Defendant terminated [her] employment due to her prior exercise of her rights under the FMLA, including taking leave for her FMLA-qualifying serious medical condition." (ECF No. 1, PageID.6.) To

establish a prima facie case of FMLA retaliation, Plaintiff must demonstrate that: (1) she was engaged in protected activity; (2) her employer knew she was engaged in the protected activity; (3) her employer took an adverse employment action against her; and (4) there was a causal connection between the protected activity and the adverse employment action. *Milman*, --- F.4th at ----, 2023 WL 387293, at *4.

In the absence of direct evidence of unlawful conduct, as here[6], the burden-shifting analysis in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–06 (1973) applies. *Bryson v. Regis Corp.*, 498 F.3d 561, 570 (6th Cir. 2007). If Plaintiff makes her prima facie showing, Defendant must then demonstrate evidence of a legitimate, nondiscriminatory reason for the adverse employment action. *Id.* "If [Defendant] articulates such a reason, then [Plaintiff] has the burden of showing that the articulated reason is in reality a pretext to mask discrimination." *Skrjanc v. Great Lakes Power Serv. Co.*, 272 F.3d 309, 315 (6th Cir. 2001). "[P]laintiff may satisfy this burden "by showing that the proffered reason (1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct." *Wexler v. White's Fine Furniture,* 317 F.3d 564, 576 (6th Cir. 2003).

Here, the parties do not dispute that Plaintiff was on FMLA leave from April 16, 2021 through June 25, 2021 with Defendant's full knowledge and approval. Moreover,

---

[6] Plaintiff's summary judgment motion initially presents her argument as if there is an absence of direct evidence. (ECF No. 24, PageID.574–81.) However, she then asserts that Mr. Sroda's testimony that Plaintiff was not terminated sooner because her elimination was "just a low priority" is direct evidence of FMLA retaliation. (Id. at PageID.579.) An example of direct evidence is when an employer tells an employee, "I fired you because you are disabled." *See Smith v. Chrysler Corp*, 155 F.3d 799, 805 (6th Cir. 1998). As a matter of law, Mr. Sroda's "low priority" comment does not amount to evidence that Defendant fired Plaintiff because she took FMLA leave.

Plaintiff's termination undeniably constitutes an adverse employment action. Thus, the first three elements are satisfied. Causality, however, is disputed. Defendant relies on *Smith v. ACO, Inc.*, 368 F. Supp. 2d 721 (E.D. Mich. 2005) (Cleland, J.), to argue that there is no evidence of Plaintiff's FMLA leave influencing its termination decision because her position was identified for elimination in spring of 2020 as part of a company-wide workforce reduction. (ECF No. 25, PageID.764.) Plaintiff contends that causation is clearly established by temporal proximity because she was terminated while still on leave. (ECF No. 24, PageID.576–77.)

"The burden of proof at the prima facie stage is minimal; all the plaintiff must do is put forth some credible evidence that enables the court to deduce that there is a causal connection between the retaliatory action and the protected activity." *Seeger v. Cincinnati Bell Tel. Co., LLC*, 681 F.3d 274, 283 (6th Cir. 2012) (quoting *Dixon v. Gonzales*, 481 F.3d 324, 333 (6th Cir. 2007)). Close temporal proximity between the protected activity and the adverse employment action can be deemed indirect evidence such as to permit an inference of retaliation to arise. *Id.* at 283–84 (citing *DiCarlo v. Potter*, 358 F.3d 408, 421 (6th Cir. 2004); *Clark v. Walgreen Co.,* 424 Fed. App'x 467, 473 (6th Cir. 2011) (per curiam); *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 525 (6th Cir.2008); *Bryson*, 498 F.3d at 571 (6th Cir.2007)).

The court finds the instructive authority of *Roll v. Bowling Green Metalforming, LLC*, 457 Fed. App'x 458 (6th Cir. 2012), relatively analogous to the case at bar. In *Roll*, the plaintiff-employee alleged that the defendant-employer violated the FMLA when it terminated his employment on the day he returned from taking five months of FMLA leave for a hand injury. 457 Fed. App'x at 458. The defendant-employer countered that

the plaintiff-employee's firing was part of a larger reduction in force precipitated by the downturn in the United States' auto industry. *Id.* The plaintiff-employee's leave, which was further extended due to complications from corrective surgery, corresponded with the defendant-employer experiencing a financial crisis that in turn prompted a 60% reduction in the plaintiff-employee's department. *Id.* at 459. The defendant-employer allowed the plaintiff-employee to remain on leave rather than terminating him when the rest of his co-workers were let go so that he could get the full benefit of his leave. *Id.* Under these facts, the Sixth Circuit found that the plaintiff-employer made out a prima facie case, even without additional evidence of retaliatory animus. *Id.* at 460.

Here, the temporal proximity between Plaintiff's FMLA leave request and termination is suggestive in and of itself of retaliation. Less than two months lapsed between when Plaintiff first required FMLA leave and her termination; less than a week's time expired between her formal FMLA request approval and Defendant's termination phone call. Per *Roll*, Defendant's argument regarding its reduction in force is more appropriate for evaluation as a nondiscriminatory reason for Plaintiff's termination. 457 Fed. App'x at 460. The court recognizes that, factually, the *Roll* reduction in force decision appears to have occurred after the employee's FMLA leave began whereas, as alleged here, the reduction in force was decided over a year in advance of its implementation. Nonetheless, given the minimal burden at the prima facie stage, the court is not persuaded that this factual difference changes its causality analysis. Further, the case at bar is distinguishable from *Smith v. ACO, Inc.*, which did not involve a reduction in force but instead presented a record replete with documentary evidence that the employee's discharge was decided in advance of his FMLA request

due to consistent performance issues. 368 F. Supp. 2d at 733. Thus, Plaintiff can sufficiently show causality by a preponderance of the evidence.

The burden thereupon shifts to Defendant to produce a nondiscriminatory reason for terminating Plaintiff. It has done so here by tendering evidence of an economic-based, company-wide reduction in force through the deposition testimony and declarations of Mr. Sroda and Ms. Schuyler, the two individuals primarily involved in the reduction decision. Defendant has further offered documentary evidence that, when combined with the testimony of Mr. Sroda and Ms. Schuyler, suggests the accounting department was part of the 2021 reduction in force, Plaintiff's position included. This is bolstered by the undisputed fact that Defendant's accounting department has operated with only three employees since August of 2021 and continues to do so today. In her motion for summary judgment, Plaintiff appears to concede that Defendant has articulated a sufficient nondiscriminatory reason for her termination, ECF No. 24, PageID.577, while contesting the very same in her response to Defendant's summary judgment motion, ECF No. 30, PageID.1250–52. However, even disregarding Plaintiff's concession, the court still finds that Plaintiff's argument against Defendant's proffered nondiscriminatory reason sounds more so in a pretext analysis and will accordingly consider it during that inquiry.

Thus, the burden ultimately falls to Plaintiff to establish some genuine issue of material fact with respect to pretext. To that end, she presents numerous arguments. While maintaining that summary judgment should be awarded in her favor, Plaintiff specifically offers fifteen "facts" that would, in her view, create a jury issue. (ECF No. 30, PageID.1252–56.) They can be summarized as follows:

1. Defendant does not present statistical or financial evidence showing that Plaintiff's position economically hampered the company generally or when compared to other accounting department posts;

2. Mr. Sroda's deposition testimony regarding Plaintiff's elimination being a low priority contradicts Defendant's allegation that its reduction in force was urgent;

3. Defendant does not present documentary evidence that Plaintiff's responsibilities were easily transferable;

4. No contemporaneous documentation exists suggesting that accounting department reductions would specifically involve Plaintiff's position;

5. The only documentary evidence that Plaintiff's specific position was contemplated for elimination came after her illness;

6. The only documentary evidence that Defendant took steps to transfer Plaintiff's job responsibilities came after her termination;

7. Defendant possesses no business records reflecting that Plaintiff's post was eliminated because it was clerical and required the lowest skill set;

8. The elimination of Plaintiff's position is not expressly documented in Mr. Holody's 2021 performance goals;

9. Mr. Holody's resignation is not comparable to an elimination in the context of a reduction in force, which calls into question Mr. Sroda's claim that Defendant effectively met its reduction goal for the accounting department with his departure;

10. As a decisional unit of one, Plaintiff's termination is distinguishable from Defendant's other reductions in force, suggesting that the same economic reasons did not inform her elimination;

11. Defendant did not sincerely want Plaintiff to be able to use the full benefit of her FMLA leave, as it terminated her before she exhausted her full twelve weeks;

12. Plaintiff's severance package was not prepared prior to her leave, suggesting that there was no formal plan to eliminate her;

13. Mr. Sroda's testimony contradicts Defendant's claim that no other employees in eliminated positions were offered other roles;

14. Mr. Sroda and Ms. Schuyler's declarations contradict their deposition testimonies because neither testified that facility closures, remote work arrangements and securing relationships were factors for delaying Plaintiff's termination;

15. Plaintiff performed duties of other employees within the accounting department and was qualified for the position of accounts payable manager.

(Id.)

Plaintiff supplements these facts with additional, and at times overlapping, arguments. Analogizing the case at bar to *Lightner v. CB&I Constructors, Inc.*, No. 14-cv-2087, 2016 WL 6693548, at *6 (S.D. Ohio Nov. 14, 2016) (Marbley, J.), Plaintiff argues that "Defendant's purported legitimate reason for termination finds no support in the contemporaneous documentation or in the testimony of Defendant's decisionmakers." (ECF No. 30, PageID.1250.) She then attacks the spreadsheet containing Mr. Holody's alleged goal of "[i]dentify options to reduce accounting department size to total 3 pp [sic]," (ECF No. 31-3, PageID.1538–48), noting that it does not specify Plaintiff's position for termination and "is undated and looks by all accounts to be modified after the fact for purposes of winning this lawsuit." (ECF No. 24, PageID.578.) She further expresses skepticism regarding how the responsibility could be marked "complete" given that Mr. Holody's departure was not a formal termination in connection with the reduction in force.

Plaintiff also stresses the impromptu nature of her elimination, emphasizing that her reduction as a decisional unit of one is suspicious because all other department reductions had decisional units of three employees or more. (ECF No. 30, PageID.1251.) She further contends that saving her from the embarrassment of a later termination is not a legitimate business objective. (ECF No. 24, PageID.579.) She then points out that the only documented communication between the decisionmakers of her termination appears in May of 2021—one month after her FMLA leave commenced and following a consultation with Defendant's legal counsel. (Id. at PageID.579–80.)

Defendant counters that Plaintiff has not, and cannot, show pretext. It begins by noting that Plaintiff failed to identify another position within the accounting department that should have been eliminated besides hers, highlighting that the billing coordinator role has not been replaced and that the accounting department operates presently with only three employees. It then dispatches Plaintiff's suspicions as to Mr. Holody's goals document, providing evidence that the last modification occurred on February 18, 2021—well before Plaintiff contracted Covid-19. (ECF No. 31, PageID.1521–22; ECF No. 31-3, PageID.1548.) Defendant further dismisses the inconsistencies Plaintiff points out about the Excel file, asserting that the fact that Defendant was unsuccessful in timely completing its reduction goal in the accounting department is inconsequential as other planned reductions did not occur. (ECF No. 31, PageID.1522.) It then argues that a negative inference cannot be drawn from Defendant seeking legal advice in May of 2021 regarding Plaintiff's termination, further asserting that the record shows Defendant consistently sought legal advice throughout 2020 and 2021 regarding its entire workforce reduction. (Id. at PageID.1523.)

Defendant also takes aim at Plaintiff's various lack of documentation arguments, asserting that companies are not required to document all rationales and business reasons when conducting a reduction in force. (ECF No. 31, PageID.1524.) It argues that the Older Workers Benefit Protection Act ("OWBPA") did not require a decisional unit disclosure for Plaintiff's severance agreement because she was not part of a group or class layoff and that a lack of OWBPA disclosure is wholly immaterial to her lawsuit, which makes no age discrimination allegation. (Id. at PageID.1526–28.) It further distinguishes *Lightner*, asserting that undisputed record evidence substantiates the

legitimacy of its 2021 workforce reduction and its plan to eliminate Plaintiff's position

well before she took FMLA leave. (Id. at PageID.1524–25.)

As explained in *Chen v. Dow Chem. Co.*, 580 F.3d 394, 402 n.4 (6th Cir. 2009):

Pretext is a commonsense inquiry: did the employer fire the employee for the
stated reason or not? This requires a court to ask whether the plaintiff has
produced evidence that casts doubt on the employer's explanation, and, if so,
how strong it is. One can distill the inquiry into a number of component parts, and
it can be useful to do so. But that should not cause one to lose sight of the fact
that at bottom the question is always whether the employer made up its stated
reason to conceal intentional discrimination. *See St. Mary's Honor Ctr. v. Hicks*,
509 U.S. 502, 515, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993) ("[A] reason cannot
be proved to be 'a pretext for discrimination' unless it is shown both that the
reason was false, and that discrimination was the real reason."); *Forrester,* 453
F.3d at 417 ("If [the proffered reason] is not the true ground, the employer may
still be innocent of discrimination; he may for example have lied to conceal a
reason that was discreditable but not discriminatory.") (citations omitted). At the
summary judgment stage, the issue is whether the plaintiff has produced
evidence from which a jury could reasonably doubt the employer's explanation. If
so, her prima facie case is sufficient to support an inference of discrimination at
trial. *Hicks,* 509 U.S. at 511, 113 S.Ct. 2742. But summary judgment is proper if,
based on the evidence presented, a jury could not reasonably doubt the
employer's explanation. *See Reeves v. Sanderson Plumbing Prod., Inc.*, 530
U.S. 133, 148, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000) ("[A]n employer would be
entitled to judgment as a matter of law if the record conclusively revealed some
other, nondiscriminatory reason for the employer's decision, or if the plaintiff
created only a weak issue of fact as to whether the employer's reason was
untrue and there was abundant and uncontroverted independent evidence that
no discrimination had occurred.").

While the proximity in time between a request for FMLA-protected leave and discharge

is sufficient evidence of a causal connection for purposes of establishing a prima facie

case of retaliation, "it is not alone sufficient to establish that an employer's legitimate,

nondiscriminatory reason for discharge was a pretext." *Heady v. U.S. Enrichment*

*Corp.*, 146 Fed. App'x 766, 770–71 (6th Cir. 2005) (citing *Skrjanc*, 272 F.3d at 317). So,

the court must determine what record evidence exists beyond proximity that would allow

a reasonable jury to find Defendant did not fire Plaintiff as part of its reduction in force.

The thrust of Plaintiff's numerous arguments culminates in a general proposition that, as evinced by a lack of documentation, her reduction in force was illegitimate. However, "[r]educing labor costs and improving efficiency are valid business reasons for conducting layoffs, even when the degree to which such actions are motivated by economic hardship is debatable." *Madry v. Gibraltar Nat. Corp.*, 526 Fed. App'x 593, 597–98 (6th Cir. 2013) (citing *Aldridge v. City of Memphis*, 404 Fed. App'x 29, 37–39 (6th Cir.2010)). Plaintiff admits that Defendant was engaged in a legitimate reduction in force with respect to other departments in the company. Common sense dictates that Plaintiff's department would be no exception to Mr. Sroda's company-wide review. Moreover, documentary evidence bears that out. While perhaps not the most sophisticated record, the "Employee Performance Evaluation – Matt Holody 2021" Excel file corroborates Mr. Sroda and Ms. Schuyler's testimony and declarations that the accounting department was part of Defendant's wider reduction in force.

Further, as Defendant points out, there is no legal requirement that a company produce financial or statistical evidence supporting the elimination of individual positions during a reduction in force or that it document why one position was chosen for elimination instead of another. "When an employer implements a RIF, the unfortunate fact is that someone has to go. It is not the prerogative of the courts to engage in the post-hoc management of the employer's internal affairs by second-guessing how personnel could have been more equitably allotted, or cost-savings better realized." *Norbuta v. Loctite Corp.*, 1 Fed. App'x 305, 314 (6th Cir. 2001). So, to the extent that Plaintiff asserts she was qualified for the already-occupied accounts payable manager position, the point packs little punch without some other indicia of discrimination.

Moreover, though Plaintiff purports to be so qualified, she claims no experience with expense reports, preparing 1099s, or verifying coding of purchase requisitions, all which are essential responsibilities according to the job description of the accounts payable manager position. (ECF No. 25-6, PageID.903.) Thus, while Plaintiff is correct that no written mention of eliminating her specific position appears until May 23, 2021, the job descriptions for the other accounting department positions and Plaintiff's own claimed abilities support Defendant's assertion that Plaintiff's position was the obvious choice for reduction due to its comparatively weaker skill requirements.[7] (*See* ECF No. 25-6, PageID.896–904.) Therefore, even when viewed in a light most favorable to Plaintiff, facts 1, 3, 4, 5, 7, 8, and 15 would not permit a jury to reasonably find pretextual Defendant's reduction in force as the basis for Plaintiff's termination.

Plaintiff is nonetheless right to question why her department's reduction did not resemble that of other departments. But Defendant has supplied reasonable answers. First, no decisional unit analysis was done for her elimination because the OWBPA does not require for non-class or -group layoffs. Next, the reason that two positions were not timely eliminated from the accounting department by June 30, 2021 was because the person tasked with identifying the positions for elimination—the Vice President of Finance Mr. Holody—did not do his job. Mr. Sroda was poised to discuss

---

[7] Why would Defendant promote Plaintiff to a new position that would require her to learn further job responsibilities when an individual, here Glenda Thomas, is already performing said position, presumably in a satisfactory manner? Especially when additional responsibilities are likely forthcoming from elimination of another management position? Common sense suggests that Defendant would not do so. And it is telling that Plaintiff has not presented evidence that she was more skilled than Ms. Thomas to be in the Accounts Payable Manager role while also likely taking on additional responsibilities.

this issue with Mr. Holody and only did not do so because of Mr. Holody's two-week's notice. Plaintiff's mere skepticism regarding this response is not enough to contradict Mr. Sroda's testimony at the summary judgment stage. *Wade v. Knoxville Utils. Bd.*, 259 F.3d 452, 463 (6th Cir. 2001); *see also Chappel v. GTE Prods. Corp.*, 803 F.2d 261 (6th Cir. 1986). Further, Defendant does not claim that Mr. Holody's departure was part of its planned reduction in force for the accounting department. Rather, it asserts that its reduction goal was effectively met, something borne out by the fact that its accounting department presently operates with only three positions. Thus, Plaintiff's point that efforts were not made until after Mr. Holody's departure to develop the controller position misses the mark. Therefore, facts 9 and 10 do not create a genuine issue of material fact as to pretext.

To the extent that Plaintiff tries to manufacture a genuine issue of material fact from "contradictory" testimony, the court is unpersuaded. Plaintiff's second point—Defendant's allegation that its reduction in force was "urgent" is contracted by Mr. Sroda testifying that Plaintiff's elimination was a "low priority"—takes both Defendant's allegation and Mr. Sroda's statement out of context. The urgency allegation was made while Defendant was generally discussing its company-wide reduction in force, the legitimacy of which Plaintiff does not dispute. Mr. Sroda made his priority comment while explaining why Plaintiff's elimination did not occur sooner. In fact, Mr. Sroda expanded on this explanation, attributing facility closures, remote work, and securing employee relationships as reasons for the delay. Yet, Plaintiff also attempts to label the expansion information as "contradictory" in her fourteenth "fact" because Mr. Sroda only provided it in a declaration and not in his deposition testimony. As the court has already

indicated, there is no contradiction here. Moreover, common sense advises that the need to navigate the effects of a sudden global pandemic would reasonably take priority over other company plans, even those economically oriented. The last contradiction Plaintiff offers in fact 13—that Mr. Sroda offered two project managers engineering jobs despite Defendant's indication that no eliminated employees were offered reemployment—has been sufficiently explained by Defendant. Specifically, Mr. Sroda testified that the reduction in force of the project management and engineering departments resulted in a consolidation of the two, meaning that the two remaining project managers were not so much eliminated as reassigned because they had engineering degrees. (*See* ECF No. 25-4, PageID.882.) Plaintiff was not offered a similar option because accounting was not being consolidated with another department. So, points 2, 13, and 14 also could not support a jury finding of pretext.

Plaintiff's eleventh point challenges Defendant's sincerity in wanting Plaintiff to enjoy the full extent of her benefits while she recovered, noting Mr. Sroda's testimony regarding saving her from embarrassment. Plaintiff asserts that, because she would not have exhausted her twelve weeks of FMLA leave by her anticipated return on June 25, 2021, Defendant sought to prevent her from using additional intermittent leave with its termination. This is speculative at best. Plaintiff provided no documentation that she would require additional leave beyond June 25th, nor did she indicate as much verbally to Mr. Holody and Ms. Schuyler during their call on June 14th. Suffice to say, a finding of pretext cannot be supported by such speculation. *Wade*, 259 F.3d at 463.

Plaintiff's strongest arguments as to pretext are contained in points 6 and 12, both of which cut against Defendant's assertion that Plaintiff's position was slated for

termination since 2020. Fact 6 highlights that the only documentary evidence of Plaintiff's job responsibilities being transferred to other employees comes in a July 9, 2021 draft announcement email, wherein Ms. Schuyler advises employees to continue sending payroll inquiries to Mr. Holody. Part of the reason for delaying the departmental reductions was to afford managers time to redistribute responsibilities. If such transfer discussions had not occurred, Defendant's reduction in force argument would be weakened. However, arguably the text of the email suggests that a transfer of responsibilities had been ongoing: to continue sending inquiries, other employees must have already been sending Mr. Holody payroll questions. More importantly, as Defendant has asserted, companies are not specifically required to document this type of action. With that said, one might reasonably expect a redistribution of responsibilities to trigger revised job descriptions.

Fact 12 points out that Plaintiff's severance agreement had not been prepared as of May 23, 2021. Plaintiff calls this a "telltale sign of retaliation," without citing to authority for the same, noting that finalization of the agreement was delayed as Defendant awaited a response from an attorney regarding its legal risk exposure. (ECF No. 30, PageID.1255.) Defendant's only response is that Plaintiff has not shown any employee's severance agreement was prepared well in advance of termination. (ECF No. 33, PageID.1741.) However, the separation agreements for the January 2021 reduction in force appear to be dated December 7, 2020 with an effective termination date of March 31, 2021. (*See* ECF No. 30-9, 1286–1304.) Although Defendant can argue that Plaintiff's illness caused some irregularities in its planning, when viewing the evidence in light most favorable to Plaintiff, a reasonable jury could infer from the timing

of the severance agreement that Defendant did not plan to terminate Plaintiff before she took FMLA leave.

Nonetheless, Plaintiff's case is too weak to survive the common sense pretext inquiry. Despite Plaintiff's efforts to show otherwise, the record is devoid of the retaliatory animus required to establish a genuine issue of material fact as to pretext. *See Reeves*, 530 U.S. at 148 ("[A]n employer would be entitled to judgment as a matter of law . . . if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred."). In so finding, the court is compelled to note that Plaintiff has not identified evidence to substantively challenge the testimony that Defendant's reduction in force extended to her department. Further, she has done nothing to show why her specific position should have been saved from elimination or why another, less-skilled employee should have been eliminated in her stead. As such, summary judgment in Defendant's favor is appropriate.

### 2. FMLA Interference

In asserting her claim of FMLA interference, Plaintiff specifically invokes the protections under 29 U.S.C. § 2615(a)(1), alleging that "Defendant terminated Plaintiff prior to the expiration of her twelve weeks of FMLA leave" and "therefore interfered with [her] FMLA leave." (ECF No. 1, PageID.7–8.) To establish a prima facie case of FMLA interference, Plaintiff must show: (1) she was an eligible employee; (2) Defendant was an employer as defined under the FMLA; (3) she was entitled to leave under the FMLA; (4) Plaintiff gave the Defendant notice of her intention to take leave; and (5) the Defendant denied her FMLA benefits to which she was entitled. *Donald v. Sybra, Inc.*,

667 F.3d 757, 761 (6th Cir. 2012). However, "[a]n employee lawfully may be dismissed, preventing him from exercising his statutory rights to FMLA leave or reinstatement, but only if the dismissal would have occurred regardless of the employee's request for or taking of FMLA leave." *Arban v. West Pub. Corp.*, 345 F.3d 390, 401 (6th Cir. 2003).

The court need not belabor its analysis on this issue given its extensive pretext analysis above. Even assuming that Plaintiff has established a prima facie claim of FMLA interference[8], Defendant has shown as a matter of law that Plaintiff's termination would have occurred regardless of her FMLA leave. To the extent that Plaintiff contends Mr. Sroda's deposition testimony regarding Plaintiff being terminated to save her from "embarrassment" is dispositive of her interference claim, the court finds that argument premised on mischaracterized testimony. The full colloquy is as follows:

> Q   So it was a high priority to terminate Noreen before she took FMLA leave?
> A   No. It was never a high priority to terminate Noreen. She just fell into the mix at some point. We're talking about an accounting clerk, an hourly employee, who, you know, possibly makes on the order of $50,000 a year. So it was just something that needed to be done for the business. It wasn't -- we did it when the timing worked. That was going to be before Noreen left, became ill, but when she did become ill, then we postponed it.
> Q   So it needed to be done for the business as soon as she returned then; is that right?
> A   The reason we did it when she returned was I didn't want to have Noreen come back and work a week or two weeks and then have to kind of go through the embarrassment of getting terminated. I wanted her -- I wanted to do it before -- when she was able to come back, when she was healthy but not to have to have her come back into the office and kind of go through the embarrassment of being terminated.
> Q   So you terminated her as soon as she returned to save her from embarrassment? Am I understanding right?
> A   Yes.

---

[8] The court is not convinced that Plaintiff has in fact met her prima facie burden. As alleged in her complaint, Plaintiff's interference claim is premised on the idea that she was not permitted to take her full twelve weeks of FMLA leave. However, she has submitted no documentary or testimonial evidence that she required leave beyond June 25, 2021 or so much as suggested as such to Defendant.

(ECF No. 25-4, PageID.879.) At best, Mr. Sroda's testimony suggests that Plaintiff's FMLA return date informed Defendant's precise timing of its reduction in force termination date—a far cry from inferring that Plaintiff was fired for taking FMLA leave. As such, and for reasons already discussed above, Defendant is entitled to summary judgment.

### B. WDCA Retaliation

As for her WDCA retaliation claim, Plaintiff alleges that Defendant retaliatorily terminated her because of a workplace absence prompted by her need to recover from a workplace injury, that is, Covid-19. (ECF No. 1, PageID.8–9.) To establish a prima facie case of retaliation under the WDCA, an employee who has suffered a work-related injury must present evidence: (1) that the employee asserted a right to obtain necessary medical services or actually exercised that right; (2) that the employer knew that the employee engaged in this protected conduct; (3) that the employer took an employment action adverse to the employee; and (4) that the adverse employment action and the employee's assertion or exercise of a right afforded under MCL 418.315(1) were causally connected. *Cuddington v. United Health Servs., Inc.*, 298 Mich. App. 264, 826 N.W.2d 519, 525 (2012).

Michigan law utilizes the *McDonnell Douglas* burden-shifting analysis to evaluate WDCA retaliation claims. *Id*. at 525–26. Thus, even assuming Plaintiff has met her prima facie burden[9], for reasons already discussed above in the court's FMLA retaliation pretext inquiry, Defendant is entitled to summary judgment.

---

[9] As with Plaintiff's interference claim, the court has concerns that Plaintiff cannot meet her prima facie burden, chiefly as it pertains to Defendant's knowledge of Plaintiff being engaged in a protected activity.

**IV. CONCLUSION**

For the reasons explained above, even when viewing the evidence in a light most favorable to her, the court finds that Plaintiff has failed to establish a genuine issue of material fact as to pretext, a flaw fatal to her FMLA retaliation and interference claims and to her WDCA claim. In terminating Plaintiff while on medical leave, the undisputed evidence shows that Defendant was properly engaged in a non-discriminatory, economic-based reduction in force. As such, Defendant it entitled to judgment as a matter of law on all of Plaintiff's claims. Accordingly,

IT IS ORDERED that Plaintiff's Partial Motion for Summary Judgment (ECF No. 24) is DENIED.

IT IS FURTHER ORDERED that Defendant's Motion for Summary Judgment (ECF No. 25) is GRANTED.


s/Robert H. Cleland                         /
ROBERT H. CLELAND
UNITED STATES DISTRICT JUDGE

Dated:  February 28, 2023

I hereby certify that a copy of the foregoing document was mailed to counsel of record on this date, February 28, 2023, by electronic and/or ordinary mail.


s/Lisa Wagner                              /
Case Manager and Deputy Clerk
(810) 292-6522


S:\Cleland\Cleland\EKL\Opinions & Orders\Civil\21-12634.HEAD.CrossMSJs.EKL.RHC.docx